(No. 23266.—

G. B. Meyer, Trustee, *vs.* F. S. Pfahler *et al.*—(Ray M. Cook, Receiver, Appellant, *vs.* G. W. Schmidt *et al.* Appellees.)

*Opinion filed December 19, 1935—Rehearing denied Feb. 6, 1936.*

ALVIN G. WHITEHOUSE, for appellant.

JESSE PEEBLES, and ALFRED A. ISAACS, for appellees.

Mr. JUSTICE SHAW delivered the opinion of the court:

This litigation originated as an interpleader in the circuit court of Macoupin county for the purpose of determining the ownership of certain real estate, notes, certificates of deposit and other evidences of indebtedness, which were conveyed to G. B. Meyer, as trustee, under an agreement of March 19, 1931, and also held under a supplemental agreement of June 23, 1931, made for the purpose of clarifying the original agreement. The first agreement recites that it is a memorandum of an express authority conferred upon Meyer, as trustee; that the individuals signing are directly interested in the success of the banking institution known as the Gillespie National Bank, at Gillespie, Illinois; that these individuals know that because of the existing depreciation in the prices of bonds the holdings of the Gillespie National Bank in such securities have considerably depreciated in value; that they also have specific information that this depression is such an extensive and serious one as to actually impair the capital of the bank; that having this information and being sincerely desirous of keeping the capital stock of the bank, as well as its general financial standing, wholly intact, the signers have, concurrently with the execution of said instrument, deposited with Meyer, as trustee, the items of property listed in the schedule attached. Quoting directly from the agreement, "they now state that they have deposited such property as a guaranty that the capital stock of the Gillespie National Bank and the solvency of said bank, shall neither one be impaired." Continuing, the agreement recites: "It

is further, however, expressly stipulated, that when the rise in the market prices of bonds shall have made it certain that no impairment of the capital stock of the said bank exists or when the earnings of the bank diverted for that purpose, have made it certain that no impairment of the capital stock of the bank now exists, then in that event it shall be the duty of Mr. G. B. Meyer as a trustee to make return to the persons signing this instrument the respective items of property listed in the schedule which have been deposited with him by the persons signing this instrument. These parties also understand that when the capital stock of the bank is not impaired, that then automatically the persons signing this instrument have the absolute right to have the items of personal property deposited by each one returned to him intact by the said trustee." This agreement was signed by F. S. Pfahler, Hugh M. Rice, D. D. Wilcox, G. W. Schmidt, T. W. Stehlin, G. B. Meyer, D. K. Rice, R. H. Isaacs, H. W. Rice, Thos. E. Elliman, J. M. Rodiner, P. H. Dorsey, G. M. Bergen, and A. H. Bauer.

The clarifying agreement executed on June 23, 1931, after reciting the provisions of the prior agreement and its purpose to clarify the same, provided that if at any time thereafter the reserve for depreciation on the bond account set aside from net earnings, added to the amount of excess value of the bonds above the value quoted and established in the report of examination of the bank as of March 10, 1931, by the national bank examiner, should equal the total value of the property held in trust, then the trustee, upon receipt of the written consent of the Comptroller of the Currency, should return the property to the persons who had originally conveyed the same. It further provided that if the Comptroller of the Currency should at any time determine that the bank could not continue to operate with safety unless said property should be transferred to the bank, then the trustee should convey said property to the bank upon the demand of the Comptroller

of the Currency, and that if, during the continuance of the trust, the bank should be declared insolvent and placed in the hands of a receiver, the trustee should then convey said property to the bank or its receiver upon demand of the receiver or the Comptroller of the Currency; that in the event of the transfer of the trust estate to the Gillespie National Bank, the bank should receipt for the same to the trustee, and the trustee should be entitled to have all net earnings of the bank, and also the amount in excess of the value of the bonds as shown by the bank examiner's report, set aside as a reserve for the depreciation in the bond account; that when said reserve for depreciation should equal the total value of the properties conveyed to the bank by the trustee, the bank, on written consent of the Comptroller of the Currency, should cause the property to be re-transferred to the persons who originally delivered them, with the further provision that if the bank should have disposed of any of said properties, the persons who originally conveyed them to the trustee should be entitled to receive in cash the amount realized from the properties. This supplemental or clarifying agreement was signed by the same persons as signed the original agreement, and also by the Gillespie National Bank by its president and under its corporate seal.

On December 19, 1931, the bank was declared insolvent. W. H. Allen was appointed receiver and thereafter made demand upon the trustee, G. B. Meyer, for all of the property held in trust. Allen afterwards resigned as receiver, and the appellant, Ray M. Cook, was substituted in his place and in this litigation. The litigation started by the filing on behalf of the trustee, Meyer, of a bill of interpleader against all of the signers of the agreement and the receiver. It was prayed, and the court afterwards ordered, that the trustee deliver all of the property to the clerk of the court, hold himself in readiness to convey the real estate as might be directed, and that the parties interplead

their respective titles and claims to the property in question. Defendants Pfahler and Wilcox answered, admitting the contracts, delivery and deposit, and also admitting the insolvency of the bank, the appointment of a receiver, the receiver's demand for the property and their own demand for the same. Their answer alleged that the agreements were without consideration, were lacking in mutuality, were *ultra vires* as to the bank, were executed by the president of the bank without authority, and that there had been sufficient appreciation in the bond account to wipe out any impairment of capital prior to the insolvency of the bank, making it the duty of the trustee to re-convey to them. Defendants Schmidt, Stehlin, Elliman, Isaacs, Dorsey and Rodiner filed a separate answer to the same general effect, as did also H. W. Rice and D. K. Rice by another separate answer. The receiver for the bank by his answer admitted the execution of the contract and agreements, the deposit of the property with the trustee, the insolvency of the bank, his appointment as receiver, and set forth his demand for the property, claiming a clear right to a decree directing its delivery to him. Defendants Hugh M. Rice, Albert Bauer, G. B. Meyer and G. M. Bergen filed no answers and were defaulted. The receiver also filed a cross-bill praying the same relief as by his answer, and further asking that judgment be entered against the respective individuals who had executed and delivered their promissory notes to the trustee for the respective amounts due thereon. After various exceptions and demurrers the pleadings were settled in more formal and proper interpleader form, but the issues remain substantially as set forth. On pleading over, six defendants, H. W. Rice, D. K. Rice, Hugh M. Rice, Albert Bauer, G. B. Meyer and G. M. Bergen, were defaulted for want of interpleader and the cause was referred to a master in chancery.

The master found that the agreements were sustained by a sufficient and valuable consideration and that the ap-

pellant was entitled to the property in question and entitled to judgment on the several promissory notes. The court sustained exceptions to this report of the master, found that the agreements were unenforcible and that the property should be returned to the depositors. The decree directs the trustee to convey to the appellees entitled thereto the several tracts of real estate theretofore conveyed to him, and further directs the clerk of the court to surrender and deliver to the various appellees the respective items of property theretofore deposited with him and tax the costs against the appellant. On this appeal eleven formal assignments of error are made, but in substance they amount only to questioning the holding of the trial court that the agreements were without consideration and were unenforcible.

Pursuant to the provisions of the new Civil Practice act, the trial judge filed his written reasons for the conclusions arrived at by him and made the same a part of the record. Inasmuch as this written opinion constitutes, in substance, the entire argument for the appellees, we will quote such parts of it as are not repetitions of the foregoing statements of fact and summarize the remainder of his holding.

After reciting the execution of the agreements the court said: "The language used in the agreement shows that the signers recognized that, by reason of depreciation in the value of bonds owned by the Gillespie National Bank, the capital stock of that bank was impaired, and being desirous of keeping the capital stock of said bank, as well as its general financial standing, wholly intact, the parties signing the instrument deposited with G. B. Meyer, as trustee, certain specific items of property as a guaranty that the capital stock of the Gillespie National Bank and the solvency of said bank should neither be impaired." The court then stated the purpose of the transfer in the terms of the agreement as set forth above, and continued: "It appears

that this agreement was executed at the suggestion of a national bank examiner. It also appears that the execution of the agreement was not demanded by him as a condition of the continued operation of the bank but was suggested, only. It appears that the original agreement was sent to the Comptroller of Currency at Washington, and that someone in his office prepared a supplemental agreement, which was signed by all of the parties who had signed the original agreement." The court then quotes at length from the supplemental agreement above set forth, and said: "The evidence does not establish that the conditions for the re-transfer of the property as specified in item 1, were ever met. The evidence discloses that the Comptroller of the Currency never did at any time, while the bank was open, demand the transfer of the property to the bank, as he might have done, under item 2 above, if he had determined that the bank could not continue to operate with safety without adding this property to its assets. During the continuance of the trust the bank was declared insolvent and thereafter demand was made for the conveyance of this property as contemplated under item 3 above. * * * As the court understands the question involved in this case, there are two theories under which stockholders or persons financially interested in banks may be held liable for notes or conveyances made to the bank for the purpose of aiding the bank in its financial difficulties. One theory, which is supported by numerous authorities, is that 'a note or bond executed by directors, officers or stockholders of a bank to make good an impairment of the bank's assets, so that the bank may continue in business is based on a valid consideration.' The authorities include numerous Illinois cases supporting this proposition and are collected in a note in 95 A. L. R. at page 534. The second theory is that a stockholder or director who gives a bank notes or securities for the purpose of making an appearance of assets may be estopped to plead lack of consideration, if

the transaction perpetrated a fraud upon the creditors of the bank or the bank examiners. The court feels that in the case under consideration the defendants who signed the agreement * * * are not estopped to plead lack of consideration. It does not appear that the agreement and accompanying execution of securities were given for an illegal or fraudulent purpose. * * * It is apparent from the record that the assets involved never did go into the assets of the bank while it was in operation; that they were not considered by the examiner as assets; if there was any published statement of assets after they had been executed, they were not included in the total of the published assets of the bank. It does not appear from anything in evidence that any creditor was induced to deposit money in the bank by reason of this agreement. Indeed it does not even appear that any creditor knew anything about it." The court then cited *Agricultural Bank* v. *Robinson*, 24 Me. 274, *Hudson State Bank* v. *Richardson*, 128 Kan. 238, and *First Nat. Bank of Harvey* v. *Trott*, 236 Ill. App. 412, in support of his holding that there was no estoppel, and continued: "Neither does the record here bring the case within the principle of the theory first above stated; under that theory notes or securities delivered to the bank to make good an impairment of the bank's assets, so that the bank may continue in business, are based on a valid consideration; but in this case the assets were not delivered to the bank, and apparently were not deposited with the trustee to enable the bank to continue to operate, but were deposited with the idea that they might thereafter be used for the purpose of keeping the bank open if the comptroller should determine that their transfer to the bank was necessary and would be sufficient for that purpose."

In this connection item 2 of the supplemental agreement is quoted by the court and is construed as a recognition on the part of the comptroller that at the time of the agreement the bank had not reached a place where it

could not operate with safety without the deposited property. The court pointed out that the comptroller permitted the bank to operate without those assets and appeared satisfied to let it continue, with a provision that he might demand them, which he never did; that possibly the situation which later developed satisfied him that even with those assets the bank could not continue. The court then said: "It does appear he recognized in the supplemental agreement that these assets were not assets of the bank and he required that the agreement provide that they might become assets upon his demand. He never did make the demand. I cannot find from this evidence that these assets were put up for the purpose of enabling the Gillespie National Bank to continue operation. It continued to operate without these assets. It seems clear that the promise found in item 3 of the supplemental contract 'to convey said property to the bank' if the bank should thereafter be declared insolvent, is not supported by any consideration."

The appellant's argument is developed along three lines: (1) That the agreements are supported by adequate consideration; (2) that the agreements, and deposits made in conformity therewith, amount to a completed trust requiring no further consideration; and (3) that the appellees are estopped either to deny consideration or to claim title to the property. It will not be necessary to consider all of these arguments in detail.

The National Banking act makes it the duty of the Comptroller of the Currency to see to it that the capital of national banks be not impaired, and if they become impaired to require the deficiency to be made up on penalty of liquidation. (U. S. C. A. title 12, secs. 55, 192.) As was held in the case of *Coast Nat. Bank* v. *Bloom,* 174 Atl. (N. J.) 576, 95 A. L. R. 528, where notes or other obligations are given to make good depreciation of capital or assets of a national bank, the inescapable inference is that the authorities in charge of national bank supervision

conceived it to be necessary to effect a replenishment of the capital, or to close the institution.

The evidence in this case makes it very clear that the first trust agreement was made as a direct result of an examination by a national bank examiner, and that it was submitted to the Comptroller of the Currency, who prepared the supplemental or clarifying agreement. It is even clearer in this case than it was in the New Jersey case quoted from, that these two agreements were made for the purpose of preventing a liquidation of the bank. It does not appear that any ruling to the effect that the capital was impaired had been actually made, yet the parties to the agreement, all interested in the continued operation of the bank, recognized and solemnly contracted that this was a fact. The interest of each of these signers was such as to constitute a valid consideration for the transfer had they given property or money or notes directly to the banking corporation. Those who were employees, only, were directly interested in the continuance of their employment; those who were officers were likewise interested in maintaining their positions, while those who were stockholders, as nearly all of the signers were, were interested in maintaining the value of their stock as an investment and in avoiding an assessment for stockholders' liability. The precise point appears never to have been presented to this court, but it has been the uniform holdings of the Appellate Court of this State that such a transaction is supported by a valuable consideration, and it has been so held by the United States Circuit Court of Appeals and by the courts of last resort of Arkansas, California, Colorado, Georgia, Iowa, Kansas, Louisiana, Massachusetts, Minnesota, New Jersey, New York, Ohio, Oregon, Texas, Utah and Washington. See cases collected in note, 95 A. L. R. 534.

We are of the opinion that there was a valuable and sufficient consideration for the making of the original and

supplemental contracts. We are also of the opinion that they were valid and enforcible as an executed trust, regardless of consideration. In *Hubbard* v. *Buddemeier*, 328 Ill. 76, we said: "A trust is created when no act is necessary to be done to give it effect and when the trust is fully and finally declared in the instrument creating it. A trust thus perfectly created and complete requires no consideration to support it.—2 Pomeroy's Eq. Jur. sec. 1001; 1 Perry on Trusts, sec. 98; *Massey* v. *Huntington*, 118 Ill. 80; *Padfield* v. *Padfield*, 68 id. 210."

When a trust is fully executed, so that nothing further remains to be done to make it effective it will be enforced in equity. (*Lynn* v. *Lynn*, 135 Ill. 18; *Chilvers* v. *Race*, 196 id. 71.) When the original and supplemental agreements in this case were signed and the property delivered to the trustee the transaction became a fully executed trust, by the terms of which the rights of the parties were thereafter to be governed. We find it to have been executed upon a sufficient consideration, and, as pointed out above, of such a character as to require no further consideration after its complete execution. The chancellor found, and the evidence sustains his finding, that the conditions under which the property might have been returned to the various depositors were never fulfilled. The trust agreement was one whole and complete instrument, not divisible into three parts, and to be enforced in accordance with its express terms. The chancellor erred in not so holding.

The judgment of the circuit court of Macoupin county is reversed and the cause remanded to that court, with directions to enter a decree and judgment in accordance with the prayer of the interpleading defendant, Ray M. Cook, as receiver of the Gillespie National Bank.

*Reversed and remanded, with directions.*